GREENPEACE, INC.,

        *Plaintiff*,

  v.

DEPARTMENT OF HOMELAND
SECURITY *et al.*,

        *Defendants*.

Civil Action No. 17-479 (TJK)

## <u>MEMORANDUM OPINION</u>

The Department of Homeland Security ("DHS") runs a government program known as

Chemical Facility Anti-Terrorism Standards ("CFATS").  The purpose of CFATS is to identify

chemical facilities that might be targeted by terrorists, and to promulgate and enforce standards

for reducing the risks arising from potential terrorist attacks on those facilities.  DHS requires

facilities to submit information about certain chemicals they possess and, based on those

submissions and other information (including information received from the broader intelligence

community), determines which facilities pose a "high risk" of significant terrorism-related harm.

Those high-risk facilities are required to implement various security measures.  Alternatively,

facilities may reduce their chemical holdings to levels that do not qualify them as high risk.

Plaintiff Greenpeace, Inc. ("Greenpeace") made a request pursuant to the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, that DHS provide information regarding previously

high-risk facilities that have reduced their chemical holdings.  After a lengthy administrative

process, DHS produced two heavily-redacted lists of facility names, withholding those names

that might serve to identify a particular facility.  DHS argues that the redacted information falls

under FOIA's law-enforcement exemption, because releasing it would threaten public safety by

increasing the risks to human life and health from terrorist attacks. Greenpeace disagrees, claiming that FOIA and DHS's own procedures require DHS to produce the records without redactions. Greenpeace has therefore brought suit against DHS and one of its components, the National Protection and Programs Directorate ("NPPD," and together with DHS, "Defendants"). Greenpeace asserts claims under FOIA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and petitions the Court for a writ of mandamus.

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment. ECF No. 11. Greenpeace has cross-moved for summary judgment. ECF No. 14.[1] For the reasons explained below, Defendants' motion will be granted and Greenpeace's will be denied. Greenpeace's claims under the APA and for a writ of mandamus will be dismissed. In addition, the Court will enter summary judgment for Defendants on Greenpeace's FOIA claim.

## I. Factual and Procedural Background

### A. The CFATS Program

Congress initially created the CFATS program in 2006. Falcon Reply Decl. ¶ 4; *see Nat'l Propane Gas Ass'n v. DHS*, 534 F. Supp. 2d 16, 18 (D.D.C. 2008) (describing history of program). The relevant act instructed DHS to issue "regulations establishing risk-based performance standards for security of chemical facilities and requiring vulnerability assessments and the development and implementation of site security plans for chemical facilities." *Nat'l*

---

[1] The Court has considered the following briefing on these motions: ECF No. 11-2 ("Defs.' Br."); ECF No. 14 at 3-42 ("Pl.'s Br."); ECF No. 17 ("Defs.' Reply"); ECF No. 19 ("Pl.'s Reply"). The Court has also reviewed each party's statement of material facts and supporting declarations and exhibits. ECF No. 11-1 ("Defs.' SoMF"); ECF No. 11-4 ("Fuentes Decl."); ECF No. 11-5 ("Falcon Decl."); ECF No. 11-6 ("Palmer Decl."); ECF No. 14 at 43-52 ("Pl.'s SoMF"); ECF No. 14 at 53-78 ("Pl.'s Resp. SoMF"); ECF No. 14-2 ("Hind Decl."); ECF No. 14-3 ("Orum Decl."); ECF No. 14-4 ("Poje Decl."); ECF No. 14-5 ("Sherman Decl."); ECF No. 17-1 ("Defs.' Resp. SoMF"); ECF No. 17-2 ("Palmer Reply Decl."); ECF No. 17-3 ("Falcon Reply Decl.").

*Propane*, 534 F. Supp. 2d at 18 (quoting Department of Homeland Security Appropriations Act, 2007, § 550(a), Pub. L. No. 109-295, 120 Stat. 1355, 1388 (2006)).  DHS did so.  *See* 6 C.F.R. pt. 27.  In 2014, Congress enacted a formal statutory framework for the CFATS program.  *See* Protecting and Securing Chemical Facilities from Terrorist Attacks Act of 2014, 6 U.S.C. § 621 *et seq.*  The Infrastructure Security Compliance Division ("ISCD"), a component of DHS located within NPPD, operates CFATS.  Pl.'s Resp. SoMF ¶ 4.

Under CFATS, DHS determines whether chemical facilities present "a high level of security risk," which means that there is "the potential that a terrorist attack involving the facility could result in significant adverse consequences for human life or health, national security or critical economic assets."  6 C.F.R. § 27.205(a).  The first step in making this determination is to identify which chemical facilities possess a "screening threshold quantity," or "STQ," of one or more "chemicals of interest."  *See* 6 C.F.R. §§ 27.105, 27.200(b)(2).  The chemicals of interest and their respective STQs are listed in Appendix A to the CFATS regulations.  *See* 6 C.F.R. pt. 27 app. A.  DHS requires chemical facilities to submit "Top-Screens," reports listing each chemical of interest that the facilities possess at or above the STQ for that chemical.  *See* Pl.'s Resp. SoMF ¶ 3; 6 C.F.R. § 27.200(b)(2).

Based on the Top-Screens and other information, including information received from the broader intelligence community about the threat of attack, DHS makes a preliminary determination of which facilities are high risk and places those high-risk facilities into one of four tiers.  *See* Pl.'s Resp. SoMF ¶ 3; 6 C.F.R. § 27.220.  DHS makes a final "tiering" decision for each facility after a "security vulnerability assessment."  6 C.F.R. §§ 27.215, 27.220(b).  High-risk facilities must then implement security measures intended to reduce the risks associated with terrorist attacks.  Pl.'s Resp. SoMF ¶ 3.

Facilities designated as high risk can also request a redetermination of their status if they alter their operations—for example, by reducing their holdings of chemicals of interest. *See* 6 C.F.R. § 27.205(b). Such facilities are informally referred to as "de-tiered," because they are no longer considered high risk and thus are not placed in one of the four tiers. *See* Falcon Reply Decl. ¶ 11. In testimony before Congress in February 2012, an NPPD official explained that, since CFATS' inception, "more than 1,600 facilities [had] completely removed their chemicals of interest, and more than 700 other facilities [had] reduced their holdings of chemicals of interest to levels resulting in the facilities no longer being considered high-risk." Defs.' Resp. SoMF ¶ 1. In February 2014, another NPPD official testified before Congress that "more than 3,000 facilities [had] eliminated, reduced or modified their holdings of chemicals of interest." *Id.* ¶ 3.

### B.     Greenpeace's FOIA Request and DHS's Response

On May 18, 2012, Greenpeace sent a letter to NPPD's FOIA office requesting "copies of all releasable documents and records that contain the most complete listing of chemical facilities that have reduced their holdings of threshold quantities of 'chemicals of interest' (COI) rendering them no longer 'high risk' facilities under [CFATS]." Fuentes Decl. Ex. B, at 1; Hind Decl. Ex. C, at 1.[2] Almost ten months later, on March 13, 2013, NPPD issued an "interim response" stating that it had conducted a search and found 123 pages of responsive records, which would be withheld in full. Fuentes Decl. Ex. C, at 1; Hind Decl. Ex. D, at 1. The asserted grounds for withholding the documents were FOIA Exemption 5, and specifically, the

---

[2] Greenpeace also requested additional records relating to "any safer chemicals, processes or methods these same facilities adopted to no longer be classified as 'high risk.'" Fuentes Decl. Ex. B, at 1. NPPD subsequently informed Greenpeace it would withhold those documents in their entirety. *See* Fuentes Decl. Ex. D. Greenpeace has not challenged NPPD's action on that additional request in this lawsuit. *See* Pl.'s Br. at 4 n.3.

deliberative process privilege; Exemption 7(E), an exemption for law-enforcement techniques, procedures and guidelines; and Exemption 7(F), an exemption for law-enforcement information whose release might endanger the safety of any individual.  Fuentes Decl. Ex. C, at 1-2; Hind Decl. Ex. D, at 1-2.

On May 12, 2013, Greenpeace appealed the interim response to DHS's Associate General Counsel.  Fuentes Decl. Ex. E; Hind Decl. Ex. E.  Greenpeace argued that the claimed exemptions did not apply.  Fuentes Decl. Ex. E; Hind Decl. Ex. E.  In particular, citing Second Circuit case law, Greenpeace argued that Exemption 7(F) did not apply because DHS had not identified any particular individual who would be harmed by release of the information.  Fuentes Decl. Ex. E, at 3 (citing *ACLU v. Dep't of Def.*, 543 F.3d 59, 71 (2d Cir. 2008), *vacated on other grounds*, 130 S. Ct. 777 (2009)); Hind Decl. Ex. E, at 3.  On September 27, 2013, while Greenpeace awaited a decision on its administrative appeal, NPPD finalized its earlier, "interim" response, standing by its decision to withhold the records but relying only on FOIA Exemptions 5 and 7(F), not 7(E).  Fuentes Decl. Ex. D.

On June 27, 2014, Greenpeace received a response on its appeal from an attorney advisor at the U.S. Coast Guard Office of the Chief Administrative Law Judge.  Fuentes Decl. Ex. H; Hind Decl. Ex. G.  The attorney advisor explained that DHS's General Counsel had assigned FOIA appeals arising within DHS to that office.  Fuentes Decl. Ex. H; Hind Decl. Ex. G; *see also* Hind Decl. Ex. F (2011 DHS memorandum assigning authority to Coast Guard).  The attorney advisor ruled as follows:  "NPPD's decision to withhold the records in their entirety pursuant [sic] is being reversed.  The Agency has not provided adequate explanation as to why the requested records should be withheld pursuant to FOIA Exemptions (b)(5), (b)(7)(E), or (b)(7)(F)."  Fuentes Decl. Ex. H, at 2; Hind Decl. Ex. G, at 2.  The attorney advisor further

explained that his decision was DHS's "final action," and that Greenpeace could seek review in federal district court.  Fuentes Decl. Ex. H, at 2; Hind Decl. Ex. G, at 2.

In an internal letter to NPPD's FOIA office, the Coast Guard attorney advisor explained the basis for his decision.  Palmer Reply Decl. Ex. CC.  He explained that he had relied on cases, including Second Circuit precedent cited by Greenpeace, holding that Exemption 7(F) is unavailable unless the agency identifies a specific person who would be harmed by release of the information.  *See id.*  NPPD disagreed with the attorney advisor's analysis of Exemption 7(F).  *See* Palmer Reply Decl. ¶¶ 12, 17.  DHS had continued to take the position in litigation that Exemption 7(F) does not require the agency to identify a specific individual who would be harmed.  *See id.* ¶¶ 12-14.  The D.C. Circuit ultimately adopted that position in 2015.  *Id.* ¶ 15 & n.3 (citing *Elec. Privacy Info. Ctr. ("EPIC") v. DHS*, 777 F.3d 518 (D.C. Cir. 2015)).  Therefore, while NPPD determined to comply with the "letter" of the attorney advisor's decision by releasing a redacted version of the documents, it would not follow the attorney advisor's reasoning in making those redactions.  *See id.* ¶ 17.

Defendants' declarations further assert that DHS was not, in any event, bound by the Coast Guard attorney advisor's decision.  They assert that, as a matter of agency procedure, DHS's Office of General Counsel reserves the right to review FOIA decisions made by Coast Guard attorney advisors.  *See* Palmer Decl. ¶ 8; Palmer Reply Decl. ¶ 7.  In this case, Defendants assert, the Office of General Counsel did just that and determined that most of the material should be redacted pursuant to Exemption 7(F), contrary to the attorney advisor's reasoning in the internal letter.  *See* Palmer Decl. ¶¶ 11-12; Palmer Reply Decl. ¶¶ 12-19.

On December 15, 2014, NPPD released the 123 pages of records to Greenpeace, but in heavily redacted form.  Fuentes Decl. Ex. I; Hind Decl. Ex. H.  The redacted records consisted of

two documents.  The first was a list of facility names (the "Unregulated Facilities List").  Hind Decl. Ex. H.  Most of the names were redacted, and those remaining were nondescript: examples include "Tucson, AZ," "College Street," "Main," and "Almond."  *Id.*  The Unregulated Facilities List concluded with approximately 20 blank pages followed by one final entry.  *See id.*  The second document (the "Untiered Facilities List") was a spreadsheet with two columns.  Fuentes Decl. Ex. J; Hind Decl. Ex. H, pt. II.  Each entry in the first column consisted of a single number ranging from 0 to 19.  *See* Hind Decl. Ex. H, pt. II.  This field represented the number of chemicals of interest that each facility held at or above STQs.  *See* Pl.'s Resp. SoMF ¶ 6.  The second column contained the name of each facility, and as in the first document, most of the names were redacted.  *See* Hind Decl. Ex. H, pt. II.  NPPD asserted that Exemption 7(F) covered the redacted material, because it "constitutes information compiled for law enforcement purposes the disclosure of which could reasonably be expected to endanger the life or physical safety of any individual."  Hind Decl. Ex. H, at 1.

On February 13, 2015, Greenpeace filed another appeal to DHS's Associate General Counsel.  Hind Decl. Ex. I.  The appeal argued that the documents NPPD had produced were "indecipherable" due to the redactions, which violated the earlier decision by the Coast Guard attorney advisor.  *See id.* at 1.  On August 25, 2015, the same Coast Guard attorney advisor responded, explaining that NPPD was "obligated to comply" with his earlier decision but that his office had "no ability to force compliance."  Hind Decl. Ex. J.  He advised that Greenpeace had exhausted its administrative remedies and could bring suit in federal district court.  *See id.*

### C.    DHS's Search Process

ISCD uses an electronic system called the Chemical Security Assessment Tool ("CSAT") to maintain records related to CFATS.  Pl.'s Resp. SoMF ¶ 4.  CSAT stores the information that chemical facilities submit to DHS pursuant to CFATS, including the information submitted in

their Top-Screens. *Id.*; Fuentes Decl. ¶ 16. DHS asserts that CSAT "is the only database within DHS that stores the information necessary to produce a complete and contemporaneous listing of chemical facilities that have reduced their holdings of threshold quantities of chemicals of interest, thereby rendering them no longer high risk facilities." Pl.'s Resp. SoMF ¶ 4. Among the information in CSAT is a name for each facility; these names are provided by the facilities themselves when they register in CSAT, and are not necessarily unique to each facility. *Id.* ¶ 8.

In June 2012, ISCD searched for records responsive to Greenpeace's requests by running two queries within CSAT. *See id.* ¶ 5. The first query yielded a spreadsheet of 2,733 facilities that DHS had previously determined to be high risk but that, as of the date of the search, were no longer considered high risk. *Id.* ¶ 6. This spreadsheet (the Untiered Facilities List that DHS ultimately produced with redactions) included both the name of each facility and the number of chemicals of interest at or above STQs. *Id.* Some of the facilities on this list "still hold a screening threshold quantity of one or more chemicals of interest" and thus continued to be regulated under CFATS, even though they were no longer considered high risk. Fuentes Decl. ¶ 17.

The second query yielded the Unregulated Facilities List that DHS also redacted and produced to Greenpeace. This list, a subset of the Untiered Facilities List, contained the names of 1,687 facilities still in operation that had reported having no chemicals of interest at or above STQs. Pl.'s Resp. SoMF ¶ 7. Because these facilities have no chemical of interest at or above an STQ, they are not regulated under CFATS. Fuentes Decl. ¶ 18. DHS explains that, due to a technical error, about 20 blank pages were inserted into the list before the last entry, but that this error did not cause any information to be withheld. *Id.* ¶ 22.

DHS asserts that, by searching CSAT, it "conducted a search of all locations likely to contain responsive documents using methods reasonably expected to uncover all relevant documents." *Id.* ¶ 23.

## D. DHS's Redactions

DHS heavily redacted both lists before producing them to Greenpeace. The redactions covered all "facility names that would allow an individual to identify the specific facility." Fuentes Decl. Ex. A (*Vaughn* index); Fuentes Decl. ¶ 26. DHS's declarants state that personnel in NPPD's FOIA office carefully reviewed each entry on the lists to redact only those entries that would allow a facility to be identified. *See* Fuentes Decl. ¶ 33. DHS invokes Exemption 7(F) to justify these redactions, abandoning the other exemptions it had asserted. It explains that ISCD is a "regulatory enforcement division" of DHS and that both lists are compiled from information obtained from regulated facilities, which face penalties if they fail to comply with CFATS regulations. Fuentes Decl. ¶ 25. Therefore, DHS asserts, they were "compiled for law enforcement purposes," the threshold requirement under Exemption 7. 5 U.S.C. § 552(b)(7); *see* Fuentes Decl. ¶ 25.

DHS offers two reasons why releasing the redacted information "could reasonably be expected to endanger the life or physical safety of any individual," as is required to satisfy Exemption 7(F). 5 U.S.C. § 552(b)(7). First, these facilities represent "soft" targets. Falcon Reply Decl. ¶ 5. Even facilities that are not determined to be "high risk" under CFATS still contain dangerous chemicals. Fuentes Decl. ¶ 30. Some facilities have chemicals of interest at or above STQs, but nonetheless are not considered high risk for a variety of reasons. *Id.*; Falcon Reply Decl. ¶ 13. Moreover, even facilities that have *no* chemicals of interest at or above STQs might still possess chemicals of interest at lower levels. Fuentes Decl. ¶ 30. Even lower levels of those chemicals can "present a risk to the lives and physical safety of individuals," particularly

those that work at or live near the facilities.  *Id.* ¶ 32.  But because those facilities are not considered *high* risk, DHS does not require them to institute security measures, making them appealing targets for terrorists.  *Id.* ¶¶ 28, 32.

In addition, DHS claims, revealing this information could help terrorists identify facilities that *are* "high risk."  DHS explains that facilities "regularly move between regulated and unregulated status, and tiered and untiered status, based on fluctuations in their chemical holdings and other facts that affect [DHS's] risk assessment of the facility (e.g., based on new threat information received from the intelligence community)."  *Id.* ¶ 31.  If DHS were required to release the unredacted lists periodically, then comparing the lists at different times would reveal the existence of some high-risk facilities: if a facility appeared on the list but later was removed, then it would be identifiable as "high risk."  *Id.*  DHS asserts that the risk of outing high-risk facilities is especially high given the age of the June 2012 lists at issue in this case: DHS is currently reanalyzing its risk determinations and expects that "approximately 5% of the previously untiered population of facilities will be determined to be high-risk and tiered." Falcon Decl. ¶ 7.

DHS claims that these threats are not just hypothetical.  One NPPD employee attests to "numerous reports from the intelligence community" discussing "the threat of terrorism involving chemicals and chemical facilities both in the United States and abroad."  Falcon Reply Decl. ¶ 6.  There have also been actual chemical attacks overseas, including "attacks at two American-owned chemical facilities in France in 2015" and a thwarted terrorist plot in Australia. *Id.* ¶ 7.

Greenpeace responds by submitting a number of declarations (all from individuals who apparently have expertise in chemical safety) challenging DHS's claim that releasing the

redacted information would pose a risk to life or physical safety. Greenpeace suggests that facilities that no longer have chemicals of interest at or above STQs are no more dangerous than "thousands of other facilities that are unregulated by CFATS" throughout the country. Orum Decl. ¶ 14. It provides examples such as underground storage tanks (which are regulated by the EPA and also listed on many state government websites) and facilities like dairy farms, which can be easily located online. Hind Decl. ¶ 17. Greenpeace further claims that *not* releasing the information would cause a safety risk: it would inhibit "developing and publicizing knowledge of successful practices at facilities" that have reduced their risk, and thereby "perpetuate unnecessary terrorist targets of opportunity." Orum Decl. ¶ 7; *see* Poje Decl. ¶¶ 11-12.

Greenpeace also asserts that much of the redacted information is already available to the public, such that there is no justification for withholding it. Many chemical facilities are "also regulated by other government agencies," which have made available lists of those facilities and the chemicals they store. Orum Decl. ¶ 15. Greenpeace notes the EPA's Toxic Release Inventory ("TRI") program, which Congress created to "provide the public with information about releases of toxic chemicals in their community." Poje Decl. ¶ 10. Pursuant to the TRI program, facilities must make annual disclosures of certain chemicals they release or otherwise dispose of. *Id.* Greenpeace also points to the EPA's Risk Management Plan ("RMP"), which requires facilities to report holdings of certain substances over threshold amounts. Hind Decl. ¶ 18. The *Houston Chronicle* maintains a searchable online listing of RMP-regulated facilities. *Id.* The chemicals covered by the TRI and RMP programs overlap with the chemicals of interest regulated by CFATS, meaning many of the facilities regulated by CFATS (and the TRI- and RMP-reportable chemicals they store) are already publicly disclosed. *Id.* ¶¶ 18-21 & Ex. K; Poje Decl. ¶ 13. And Greenpeace asserts that information about these facilities can also be accessed

through "a) web searches, phone books, tax records, or other public databases or records; b) direct observation; or c) engineering or other analysis of information sources that are lawfully disclosed or required to be disclosed." Orum Decl. ¶ 13.

DHS's response is twofold. First, it points out that CFATS overlaps only incompletely with these other sources of public information, meaning that revealing the redacted names will provide terrorists with a new source of potential targets. *See* Falcon Reply Decl. ¶ 10. Next, and perhaps more importantly, DHS asserts that the availability of public information about chemical facilities makes the redacted information more dangerous, not less dangerous. A terrorist could cross-check the already-public lists against the lists of facilities that are not "high risk," using the former to identify facilities holding chemicals they want to exploit, and the latter to determine which of those facilities are soft targets. *See id.* ¶ 11.

Greenpeace also asserts that DHS has failed to satisfy FOIA's segregability requirement. Greenpeace claims that, to the extent some facilities have "completely and permanently remov[ed] chemicals of interest from their operations," there is no threat to releasing those facilities' names. Orum Decl. ¶ 8. Moreover, Greenpeace claims, DHS should be able to identify those facilities. By statute, DHS is required to "document the basis" for determining that a facility will no longer be subject to CFATS requirements. *Id.* ¶ 9 (citing 6 U.S.C. § 622(e)(3)(A)). Nonetheless, DHS has redacted those facilities' names.

DHS responds that it cannot identify those facilities that have "completely and permanently" removed all chemicals of interest. First, the statutory provision Greenpeace relies on did not go into effect until 2015, just after DHS had made its December 2014 production of the documents at issue. Falcon Reply Decl. ¶ 12. Before 2015, the CFATS program did not maintain information about why facilities were "de-tiered" in a "searchable format." *Id.* In any

event, DHS explains, it does not ask facilities whether they have "completely and permanently" removed chemicals of interest. Facilities are often de-tiered because they have reduced one particular chemical of interest below its STQ; therefore, the recorded "reasons" for de-tiering those facilities do not include whether *all* of their chemicals of interest have been removed. *Id.* ¶ 13. In addition, facilities do not report whether they have "permanently" removed chemicals of interest, and so DHS has no way of knowing that fact. *Id.* ¶ 14.

### E.     This Action

On March 16, 2017, Greenpeace filed this lawsuit. ECF No. 1 ("Compl."). Greenpeace brings three causes of action. The first, under FOIA, alleges that the Coast Guard attorney advisor's June 2014 decision obligated DHS to produce the entirety of the requested records. *Id.* ¶ 23. Greenpeace claims it is entitled to release of the records, "without redactions," under 5 U.S.C. § 552(a)(4). *Id.* ¶ 27. Greenpeace's second cause of action, under the APA, similarly alleges that DHS unlawfully withheld agency action by failing to comply with the attorney advisor's decision. *Id.* ¶ 30. Greenpeace asserts that, "[i]f no relief was available under FOIA," it is entitled to declaratory and injunctive relief under the APA. *Id.* ¶ 32. Finally, Greenpeace alleges that it is entitled to a writ of mandamus compelling DHS to produce the unredacted records in the event that FOIA and the APA do not provide the requested relief. *Id.* ¶ 36.

Defendants have moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, alternatively, for summary judgment under Rule 56. ECF No. 11.

## II.     Legal Standard

### A.     Motion to Dismiss

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint.'" *Herron v. Fannie Mae*, 861 F.3d 160,

173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.* "To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

District courts "may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). In such cases courts must, as when reviewing a Rule 12(b)(6) motion, "accept[] as true all of the factual allegations contained in the complaint." *KiSKA Const. Corp. v. WMATA*, 321 F.3d 1151, 1157 (D.C. Cir. 2003).

### B. Motion for Summary Judgment

Under Rule 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Id.* (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). Congress enacted FOIA in 1966 to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). "FOIA 'mandates that an agency disclose records on request, unless they fall within one of nine exemptions.'" *EPIC v. DHS*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011)).

In FOIA cases, "to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "The court may rely on a 'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Id.* at 580-81 (quoting *Oglesby*, 920 F.2d at 68). "The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology, consistent with congressional intent tilting the scale in favor of disclosure . . . ." *Morley*, 508 F.3d at 1114 (quoting *Campbell v. DOJ*, 164 F.3d 20, 27 (D.C. Cir. 1998)).

In addition, if the agency has invoked any of FOIA's exemptions, the "burden is on the agency to justify withholding the requested documents, and the FOIA directs district courts to determine *de novo* whether non-disclosure was permissible." *EPIC*, 777 F.3d at 522. "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). That is, the agency must provide a "logical" or "plausible" justification for the exemption. *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)). The agency cannot rely on "conclusory and generalized allegations of exemptions." *Morley*, 508 F.3d at 1114-15 (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. NSA*, 610 F.2d 824, 830 (D.C. Cir. 1979)).

FOIA further requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The court has an affirmative duty to ensure that this requirement is satisfied, even if it must do so *sua sponte*. *See Morley*, 508 F.3d at 1123.

### III.  Analysis

As explained below, the Court will grant Defendants' motion and deny Greenpeace's motion. Greenpeace's claims under the APA and for a writ of mandamus will be dismissed for failure to state a claim and lack of subject matter jurisdiction, respectively. In addition, the Court will grant summary judgment for Defendants on Greenpeace's FOIA claim.

#### A.  Motion to Dismiss

As discussed below, the Court agrees with DHS that Greenpeace's FOIA claim must be dismissed insofar as it asks the Court to "enforce" the Coast Guard attorney advisor's decision, although the Court will allow the FOIA claim to proceed to summary judgment under a *de novo* standard of review. In addition, Greenpeace's APA and mandamus claims must be dismissed in their entirety.

### 1. Freedom of Information Act

In its complaint, Greenpeace asserts that it has a right under FOIA to the unredacted records "[p]ursuant to" the June 2014 decision of the Coast Guard attorney advisor. Compl. ¶ 23. That is, it seeks to have this Court "compel" DHS to abide by the attorney advisor's decision. Pl.'s Br. at 2. But such a claim is not cognizable under FOIA because it would entail this Court deferring to the attorney advisor's decision on the merits. FOIA, by contrast, requires the Court to "determine the matter de novo." 5 U.S.C. § 552(a)(4)(B). "De novo means here, as it ordinarily does, a fresh, independent determination of 'the matter' at stake; the court's inquiry is not limited to or constricted by the administrative record, nor is any deference due the agency's conclusion." *Doe v. United States*, 821 F.2d 694, 697-98 (D.C. Cir. 1987) (en banc) (R.B. Ginsburg, J.) (interpreting identical language in Privacy Act). That is, the Court is "to put itself in the agency's place, to make anew the same judgment earlier made by the agency." *Id.* at 698. Therefore, to the extent that Greenpeace seeks to "enforce" the attorney advisor's decision, Pl.'s Br. at 12, it does not state a valid claim for relief.

Greenpeace argues that the following provision of FOIA gives rise to such an "enforcement" claim: "Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request." 5 U.S.C. § 552(a)(6)(C)(i). But this provision does not purport to provide a remedy. It merely goes to timing, requiring agencies to release records "promptly," which "typically would mean within days or a few weeks of a 'determination,' not months or years." *Citizens for Responsibility & Ethics in Wash. ("CREW") v. FEC*, 711 F.3d 180, 188 (D.C. Cir. 2013). If the agency fails to live up to this obligation, the remedy is the one that the statute provides: the requester can immediately seek *de novo* review in federal district court. 5 U.S.C. § 552(a)(4)(B). "Where, as here, 'a statute expressly provides a remedy, courts must be especially reluctant to

provide additional remedies.'" *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1675 (2017) (quoting *Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533 (1989)); *see also Nw. Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 94 (1981) ("It is, of course, not within our competence as federal judges to amend these comprehensive enforcement schemes by adding to them another private remedy not authorized by Congress.").

In most cases, *de novo* review is a boon to plaintiffs: unlike the APA standard of review, *de novo* review generally affords no deference to the agency's decisions. *See Cause of Action v. FTC*, 799 F.3d 1108, 1115 (D.C. Cir. 2015). *But cf. Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 926-28 (D.C. Cir. 2003) (explaining that deference is due where executive branch invokes national-security and law-enforcement exemptions). Moreover, FOIA reverses the normal burden of proof, requiring the agency, not the plaintiff, to prove that it conducted an adequate search and to justify any exemptions it claims. *See* 5 U.S.C. § 552(a)(4)(B); *EPIC v. NSA*, 678 F.3d 926, 932 (D.C. Cir. 2012); *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003).

But FOIA plaintiffs must take the bitter with the sweet. The FOIA standard of review does disadvantage plaintiffs who would prefer to focus on the niceties of agency procedure instead of the merits of their claims. Under the APA, it would be arbitrary and capricious for an agency to change its mind without acknowledging it had done so and providing an adequate explanation. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016). Similarly, it would be arbitrary and capricious for an agency to deviate from an administrative law judge's decision without a reasoned explanation. *See Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2005). And under the APA, an agency generally cannot defend its actions in court for reasons that are absent from the administrative record. *See Williams Gas Processing-Gulf Coast*

*Co. v. FERC*, 475 F.3d 319, 328-29 (D.C. Cir. 2006). Under a *de novo* standard, by contrast, all that matters is whether the agency reached the right outcome. Accordingly, an agency is free to advance new justifications for withholding documents under FOIA once it comes to court. *See Bayala v. DHS*, 827 F.3d 31, 35-36 (D.C. Cir. 2016).

The briefs in this case have addressed numerous arcane questions, such as: whether the Court Guard attorney advisor is properly characterized as an "administrative law judge," *see* Pl.'s Reply at 7 n.1; whether DHS's Office of the General Counsel fully delegated its FOIA appeals process to the Coast Guard Office of the Chief Administrative Law Judge, or instead retained the authority to review the Coast Guard's decisions, *see* Defs.' Reply at 27-30; whether any such retention of authority amounted to an improper "secret veto," Pl.'s Br. at 7-8; which decision represented DHS's "final action" on Greenpeace's FOIA request, Pl.'s Reply at 6-10; and whether DHS regulations allow for multiple administrative appeals, *see* Pl.'s Br. at 17 n.9. Not one of those issues matters, however, to the question before the Court: whether Greenpeace is entitled to the documents it seeks on the merits.

That is not to say that FOIA's procedural provisions are irrelevant. Plaintiffs must exhaust their administrative remedies under FOIA before going to court. *See CREW*, 711 F.3d at 184. (Defendants concede that Greenpeace has satisfied that requirement in this case. Defs.' Reply at 2.) If the agency fails to follow FOIA's procedures, "the 'penalty' is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting into court." *CREW*, 711 F.3d at 189. But the agency suffers no prejudice on the *merits* of its defense, nor could it, because review must be *de novo*.

Greenpeace also argues that *Payne Enterprises, Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988), authorizes the remedy it seeks. *See* Pl.'s Br. at 17-19. That case concerns the

availability of prospective relief—that is, an order that the agency provide documents *beyond* those falling within the particular request before the court—based on a "policy or practice" of agency misconduct. *See Ctr. for Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 874 F.3d 287, 292 (D.C. Cir. 2017). *Payne* decidedly lacks any relevance in deciding the propriety of a *single* FOIA request. Indeed, "the allegation of a single FOIA violation [is] insufficient as a matter of law to state a policy or practice claim" under *Payne*. *Scudder v. CIA*, 281 F. Supp. 3d 124, 129 (D.D.C. 2017).

Therefore, to the extent Greenpeace seeks merely to "enforce" the attorney advisor's ruling, without an inquiry into the merits of that ruling, its claim must be dismissed. Nonetheless, construing Greenpeace's complaint liberally in its favor, it also states a traditional claim for documents withheld "[i]n violation of FOIA." Compl. ¶ 25. The Court will accordingly consider the merits of Greenpeace's claim on *de novo* review. That issue cannot be resolved on a motion to dismiss, and so the Court will consider it below on the parties' cross-motions for summary judgment.

### 2. Administrative Procedure Act

Greenpeace also requests, in the alternative, that the Court compel DHS to comply with the Coast Guard attorney advisor's ruling under the APA. *See* Pl.'s Br. at 29-32. This APA claim fails because Greenpeace already has an adequate remedy under FOIA. The APA only authorizes the review of actions "for which there is no adequate remedy in a court." 5 U.S.C. § 704. In *CREW v. DOJ*, 846 F.3d 1235 (D.C. Cir. 2017), the D.C. Circuit considered whether a FOIA policy-or-practice claim under *Payne* was an "adequate remedy" that foreclosed similar relief under the APA. *See id.* at 1244. The D.C. Circuit noted that, where Congress has afforded plaintiffs a private right of action, there generally is no APA remedy. *See id.* at 1244-45. That is particularly true where Congress has provided for *de novo* review, "given the frequent

'incompat[ibility]' between *de novo* review and the APA's deferential standards." *Id.* at 1245 (alteration in original) (quoting *Envt'l Def. Fund v. Reilly*, 909 F.2d 1497, 1506 (D.C. Cir. 1990)). The D.C. Circuit concluded that FOIA did offer an adequate remedy, reasoning that the "creation of both agency obligations and a mechanism for judicial enforcement in the same legislation suggests that FOIA itself strikes the balance between statutory duties and judicial enforcement that Congress desired." *Id.*

The same is true here. Greenpeace's theories about the effect of the agency process aside, this is a run-of-the-mill FOIA case involving a request that DHS turn over specific information it has withheld. Plainly, FOIA offers an "adequate remedy": it provides the exact relief that Greenpeace has requested—an order to turn over the requested information—if Greenpeace can show it is actually entitled to that relief. Greenpeace's argument is, in essence, that a FOIA claim is not an adequate remedy in this case because Greenpeace might fare worse under *de novo* review than under the APA standard of review. *See* Pl.'s Br. at 32. But as the D.C. Circuit has explained, an "adequate" remedy does not necessarily mean an "identical" remedy. *See CREW*, 846 F.3d at 1245. The fact that Greenpeace must proceed under FOIA's *de novo* standard of review does not mean that FOIA's remedy is inadequate. Therefore, Greenpeace's APA claim must be dismissed for failure to state a claim.[3]

### 3. Mandamus

Finally, Greenpeace argues that it is entitled to a writ of mandamus. The threshold jurisdictional requirements for mandamus require plaintiffs to demonstrate, among other things, "that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189

---

[3] While Defendants argue that the APA's "adequate remedy" rule is a jurisdictional bar and that the Court should dismiss under Rule 12(b)(1), *see* Defs.' Br. at 13, they are incorrect. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017).

(D.C. Cir. 2016).  Greenpeace fails to meet this requirement because, as explained in connection with its APA claim, FOIA offers an adequate remedy if the government has unlawfully withheld information.  Therefore, the "court must dismiss . . . for lack of jurisdiction."  *Id.*

### B.  Motions for Summary Judgment

For the reasons explained below, reviewing the record on a *de novo* basis, the Court concludes that it must enter summary judgment for Defendants on Greenpeace's FOIA claim.

### 1.  Adequacy of Defendants' Search

To obtain summary judgment, Defendants must show "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  In this case, Greenpeace requested "the most complete listing of chemical facilities that have reduced their holdings of threshold quantities of 'chemicals of interest' (COI) rendering them no longer 'high risk' facilities under [CFATS]."  Hind Decl. Ex. C, at 1.  In order to produce such a listing, Defendants queried CSAT, "the only database within DHS that stores the information necessary to produce a complete and contemporaneous listing of chemical facilities that have reduced their holdings of threshold quantities of chemicals of interest, thereby rendering them no longer high risk facilities."  Pl.'s Resp. SoMF ¶ 4.  Plaintiffs have admitted that CSAT is, in fact, the only such database.  *See id.*  Defendants' queries returned lists of facilities that previously had been considered high risk, but had since been determined not to be high risk.  *See id.* ¶ 6.

Greenpeace has not challenged the adequacy of this search, and the Court concludes that Defendants have met their burden of showing a good faith effort to locate all responsive records using reasonable methods.

## 2. Exemption 7(F)

The parties do, however, vigorously dispute the applicability of Exemption 7(F). To satisfy Exemption 7(F), Defendants must show (1) that the information was "compiled for law enforcement purposes" (a threshold requirement applying to all subsections of Exemption 7) and (2) that production of these materials "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7).

### a. "Compiled for Law Enforcement Purposes"

As a threshold matter, the government must establish "that the records were 'compiled for law enforcement purposes.'" *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico* ("*PEER*"), 740 F.3d 195, 203 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)(7)). "[T]he agency's activity 'must be related to the enforcement of federal laws or to the maintenance of national security,'" and "the nexus between the [activity] and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Pinson v. DOJ*, 202 F. Supp. 3d 86, 101-02 (D.D.C. 2016) (second alteration in original) (quoting *Pratt v. Webster*, 673 F.2d 408, 420-21 (D.C. Cir. 1982)).

Defendants argue that the records at issue satisfy this threshold requirement because ISCD is a "regulatory enforcement division" of DHS and because the records consist of information obtained from facilities regulated under CFATS. Fuentes Decl. ¶¶ 24-25. Greenpeace has not contested that the records satisfy Exemption 7's threshold requirement, and the Court concludes that they do. DHS's mission is, among other things, to "prevent terrorist attacks within the United States." 6 U.S.C. § 111(b)(1)(A). That is a "law enforcement" function, because it involves "proactive steps designed to prevent criminal activity and to maintain security." *PEER*, 740 F.3d at 203 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 582

(2011) (Alito, J., concurring)).  And DHS compiled the particular information at issue pursuant

to that function, in order to reduce the risk from terrorist attacks at the chemical facilities it

regulates.  *See* 6 U.S.C. § 622(a)(2)(B); 6 C.F.R. § 27.100.  "[S]teps by law enforcement officers

to prevent terrorism surely fulfill 'law enforcement purposes.'"  *PEER*, 740 F.3d at 203 (quoting

*Milner*, 562 U.S. at 583 (Alito, J., concurring)).  Therefore, this information, by its very nature,

satisfies Exemption 7's threshold requirement.

### b. "Could Reasonably Be Expected to Endanger the Life or Physical Safety of Any Individual"

The crux of the parties' dispute is whether releasing the information in question "could

reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C.

§ 552(b)(7)(F).  "That language is very broad."  *PEER*, 740 F.3d at 205.  It "does not require that

a particular kind of individual be at risk of harm; 'any individual' will do."  *Id.*  Nor is the

agency required "to specifically identify the individuals who would be endangered."  *EPIC v.*

*DHS*, 777 F.3d 518, 520 (D.C. Cir. 2015).   Moreover, disclosure "need not *definitely* endanger

life or physical safety; a reasonable expectation of endangerment suffices."  *PEER*, 740 F.3d at

205.  Courts "have consistently deferred to executive affidavits predicting harm to the national

security, and have found it unwise to undertake searching judicial review."  *Id.* (quoting *Ctr. for*

*Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003)).

The D.C. Circuit has held that, in cases "involving documents relating to critical

infrastructure, 'it is not difficult to show that disclosure may "endanger the life or physical safety

of any individual."'"  *Id.* at 205-06 (quoting *Milner*, 562 U.S. at 582 (Alito, J., concurring)).

Archetypal examples of critical infrastructure include "bridges, airports, railroad tracks, dams

and research facilities."  *Id.* at 198.  Courts have thus concluded that Exemption 7(F) protects

"inundation maps" that show the potential harm from burst dams, *see id.* at 206, documents

discussing the risks from potential spills at vulnerable locations along oil pipelines, *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 522 (D.D.C. 2017), information about nuclear defense, *see Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 234 F. Supp. 3d 65, 83 (D.D.C. 2017), and protocols for shutting down wireless devices that could be used to detonate bombs, *see EPIC*, 777 F.3d at 523. The parties dispute whether the chemical facilities at issue in this case constitute "critical infrastructure." Pl.'s Br. at 24; Defs.' Reply at 12. Regardless of how they are labeled, however, identifying information about these facilities shares a key characteristic with the foregoing examples: it represents highly useful information for terrorists planning attacks on them.

All of the chemical facilities at issue, at one point, contained chemicals at levels so dangerous they were categorized as "high risk"—meaning there was the potential that a terrorist attack on these facilities "could result in *significant* adverse consequences for human life or health, national security or critical economic assets." 6 C.F.R. § 27.205(a) (emphasis added). As Defendants point out, these facilities continue to pose some risk to life or health arising from potential terrorist attacks. DHS's risk methodology "is not designed or intended to identify *all* facilities where an attack employing the facility's chemicals would result in a loss to human life." Defs.' Br. at 11. The CFATS program focuses its resources on facilities that are "high risk." Other facilities are not necessarily "no risk"—they may be "low risk," "medium risk," or somewhere in between. Indeed, it seems unlikely that all chemical facilities previously categorized as "high risk" would now pose no risk at all. The government's affidavits say just that: many facilities that are not "high risk" nonetheless continue to have chemicals of interest at or above STQs—amounts that DHS considers dangerous enough to warrant a report to the government. Fuentes Decl. ¶ 30; Falcon Reply Decl. ¶ 13. And even facilities with no

chemicals of interest at or above STQs may continue to hold those chemicals at levels below STQs. Fuentes Decl. ¶ 30.

And there is more. Whether a facility is considered "high risk" does not depend merely on the chemicals of interest it holds. It is also based on information received from the broader intelligence community about the threat to those facilities. Pl.'s Resp. SoMF ¶ 3; Fuentes Decl. ¶ 31. Accordingly, disclosing which facilities are considered "high risk," and which are not, has the potential to reveal the government's thinking about which facilities are *likely* targets for terrorist attacks, and which are not. Revealing the names of "de-tiered" facilities would be dangerous in at least two respects. First, it would provide terrorists with valuable insight into how the United States government, including its intelligence services, assesses the risk of attacks on chemical facilities in this country. Making strategic insights about national security matters available to the general public (including our country's enemies) has the inherent potential to cause harm. *Cf. ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 624-25 (D.C. Cir. 2011) (discussing potential harm from providing terrorists with "insight" into "the CIA's core mission of collecting and analyzing intelligence that reveals the plans, intentions and capabilities of the nation's enemies"). Second, such revelations would effectively identify "de-tiered" facilities as "soft targets" for terrorists. DHS does not require "de-tiered" facilities to implement security measures under CFATS. *See* Falcon Reply Decl. ¶ 5. Releasing the lists would thus allow terrorists to adjust their aim to focus on the very facilities that the government has decided are unlikely to be targeted.

Moreover, as Defendants point out, this single request cannot be viewed in isolation. If the lists of "de-tiered" facilities are not exempt, then nothing would stop FOIA requesters from seeking refreshed lists at different points in time. Defendants' affidavits confirm that facilities

do, in fact, fluctuate into and out of "high risk" status as DHS's assessments change. *See id.*; Falcon Decl. ¶ 7. And whenever facilities on an earlier version of the list disappear from a later version, that would mean those facilities are once again "high risk," revealing the identity of the very facilities DHS is most determined to protect. Fuentes Decl. ¶ 31. Greenpeace's response is that DHS could limit future releases to mitigate this risk. That is, DHS could "redact or withhold the facilities that have previously been included and provide only the additions." *See* Pl.'s Br. at 24. This approach, Greenpeace argues, would "limit[] the ability of any would-be bad actors from comparing the complete lists at various times." *Id.* But Greenpeace provides no authority for its proposed approach. Rather, the idea that FOIA would require the release of certain information, but only to the first person who requests it, is obviously quite preposterous. "There is no mechanism under FOIA for a protective order allowing only the requester to see whether the information bears out his theory, or for proscribing its general dissemination." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004). That is, "if the information is subject to disclosure, it belongs to all." *Id.* at 172.

Finally, it is telling that Congress has limited DHS's ability to reveal the very information that Greenpeace has requested. By statute, DHS is required to make semi-annual reports to certain congressional committees, providing the number of instances in which facilities were either placed "in a lower risk tier" or "de-tiered," along with the reasons for those decisions. *See* 6 U.S.C. § 622(e)(4)(B)(i). But DHS must provide this information "in a sufficiently anonymized form to ensure that the information does not identify any specific facility or company as the source of the information when viewed alone or in combination with other public information." *Id.* § 622(e)(4)(B)(ii). The deanonymized information Congress took care

to protect—names detailed enough to identify specific facilities—is precisely what Greenpeace wants DHS to disclose.

For all these reasons, DHS has met its burden of showing that the information at issue, if released, "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). That requires showing only "a reasonable expectation of endangerment" of human life or health, *PEER*, 740 F.3d at 205, which means *some* risk, not necessarily a *high* risk. Defendants have made such a showing here, because even though these facilities are no longer designated as "high risk," releasing identifying information about them could aid terrorists in identifying targets and thus would increase the risk of deadly attacks. *Cf. id*. at 206 ("Terrorists or criminals could use [inundation map] information to determine whether attacking a dam would be worthwhile, which dam would provide the most attractive target, and what the likely effect of a dam break would be.").

Greenpeace offers its own evidence to show that "[p]roviding the list of chemical facilities that are no longer 'high risk' under CFATS cannot be reasonably expected to endanger anyone." Pl.'s Resp. SoMF ¶ 11. But its showing is insufficient to create a genuine issue of material fact.

First, Greenpeace argues that the risks of releasing the identities of these facilities are minor and outweighed by the benefits of taking such action. They point out, for example, that many of the chemical facilities on the list have no chemicals of interest at or above STQs. *See* Pl.'s Br. at 22-23. Of course, Greenpeace does not have information from the intelligence community to inform its assessment of the risks involved. DHS does, and the Court owes deference to DHS's assertion that potential attacks against such facilities continue to pose a risk because they may still hold those chemicals at lower levels. *See PEER*, 740 F.3d at 205; Fuentes

Decl. ¶ 30.  Nor can the Court conclude that Greenpeace has raised a genuine issue of material fact with its evidence (in the form of expert affidavits) that "the more likely consequence of greater awareness of such reductions in inventories of dangerous chemicals is that, like other government programs involving hazardous chemicals where regulated facilities are publicly disclosed, disclosure creates an incentive for reductions, and more facilities will reduce their inventories of chemicals of interest, increasing safety."  Pl.'s Br. at 23 (citing Poje Decl. ¶¶ 10-12; Orum Decl. ¶¶ 7, 12).  These affidavits miss the mark.  Exemption 7(F) merely requires the government to show "a reasonable expectation of endangerment" if the records are released.  *PEER*, 740 F.3d at 205.  It is not a "balancing test" that requires the agency to weigh that danger against possible benefits of releasing the information.  *Pinson v. DOJ*, 236 F. Supp. 3d 338, 368 (D.D.C. 2017).  Therefore, DHS is not required to show that risks to human life and health from potential terrorist attacks outweigh the possibility that withholding the information might inhibit the development of best practices by the private sector.

Greenpeace also relies heavily on the fact that the public already has access to information about many of these facilities and the chemicals they hold from various public sources (including the EPA).  *See* Pl.'s Br. at 25-27.  The Court agrees in principle that "where information requested 'is truly public, then enforcement of an exemption cannot fulfill its purposes.'"  *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)).  But the Court "must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before [finding] a waiver."  *Id.* at 555.  That is, the "same agency" must have previously disclosed the "exact information" at issue.  *Valfells v. CIA*, 717 F. Supp. 2d 110, 117 (D.D.C. 2010); *see Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999).  This

"insistence on exactitude" protects "the Government's vital interest in information relating to national security and foreign affairs." *ACLU*, 628 F.3d at 621 (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)).

Here, Greenpeace can show only that certain public disclosures by other agencies "overlap with" the lists of CFATS-regulated facilities—not that any agency, much less DHS, has previously produced the exact information at issue. *See* Pl.'s Br. at 26; Falcon Reply Decl. ¶ 10. In fact, the information Greenpeace seeks is qualitatively different from publicly available information. *Cf. ACLU*, 628 F.3d at 620-21 (declining to require the production of classified information that, the government asserted, was "of a qualitatively different nature" from publicly available information). It would reveal not only the location of the facilities, but also the fact that DHS previously considered them as "high risk"—but now does not. This information is of a different nature and was compiled for a different purpose than information released by other agencies. For example, the EPA provides certain information about chemical facilities in order to "promote emergency planning and to provide the public with information about releases of toxic chemicals in their community." Poje Decl. ¶ 10. DHS's risk determinations under CFATS, by contrast, are based on facilities' chemical holdings *and* insight from the intelligence community about the threat posed to those facilities, for the purpose of reducing the potential for harm arising from terrorist attacks. Pl.'s Resp. SoMF ¶ 3. Such information enriches, and does not merely repeat, the information already in the public domain. As Defendants persuasively claim, terrorists might combine these different sources of information to make better-informed decisions about which facilities to target. Falcon Reply Decl. ¶ 11. Therefore, Greenpeace's evidence fails to raise a genuine issue of material fact: even if true, it does not undermine

Defendants' showing that releasing the records at issue "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).

While there are surely many hard cases under Exemption 7(F), this is not one of them. The information in question was compiled by DHS in order to keep our country safe from terrorist attacks. Disclosing it would reveal the location of facilities containing dangerous chemicals terrorists might target, as well as how the government has assessed the risks posed by those facilities—all information that terrorists might exploit. Such disclosures would thus risk the life and health of persons working at or living near those facilities, who would be harmed in the event of a terrorist attack. Therefore, DHS has properly invoked Exemption 7(F).

### 3. Segregability

Finally, Greenpeace argues DHS has failed to segregate a subset of the facility names that can be released without endangering human life or health. Under FOIA, any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Hodge v. FBI*, 703 F.3d 575, 582 (D.C. Cir. 2013) (alteration in original) (quoting *Sussman v. U.S. Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)). Defendants must, however, identify the exempt material and "provide descriptions of excerpts deemed to be non-segregable, with explanations as to these decisions." *Am. Immigration Council v. DHS*, 950 F. Supp. 2d 221, 248 (D.D.C. 2013).

DHS has clearly identified the exempt material (which is marked with redaction boxes) and described it: "The redacted portions are facility names that would allow an individual to identify the specific facility." Fuentes Decl. Ex. A (*Vaughn* index). DHS also explains that it decided which names to redact by performing a line-by-line review of each name individually.

*See* Fuentes Decl. ¶ 33. Greenpeace does not dispute that DHS performed this process reasonably. If anything, DHS may have been too generous: Greenpeace reports that several of the redacted entries "may reflect identifiable facilities." Pl.'s Br. at 9 n.6.

Greenpeace does argue, however, that DHS should have segregated and produced the names of those facilities that no longer pose *any* risk. In particular, Greenpeace claims, DHS could have identified facilities that "completely and permanently remov[ed] chemicals of interest from their operations." Orum Decl. ¶¶ 8-9. Greenpeace points to an NPPD official's 2012 testimony that "since [CFATS'] inception, more than 1,600 facilities completely removed their chemicals of interest." Defs.' Resp. SoMF ¶ 1. Similarly, in 2014, an official testified that "more than 3,000 facilities have *eliminated*, reduced or modified their holdings of chemicals of interest." *Id.* ¶ 3 (emphasis added). Greenpeace also argues that some facilities may only hold chemicals of interest that are common (such as a nitromethane, which is used in race cars and can be purchased legally) and thus pose no special risk. *See* Pl.'s Br. at 28 (citing Falcon Decl. ¶ 6). Finally, Greenpeace points to the fact that DHS is required, by statute, to record the reasons why any chemical facility is "de-tiered." Pl.'s Br. at 28-29 (citing 6 U.S.C. § 622(e)(3)). Those records, Greenpeace asserts, should allow DHS to identify which facilities have completely divested themselves of chemicals of interest, or at least of all chemicals except the common ones that pose no real risk. *See id.*

Defendants concede that there is no risk from facilities that have "completely and permanently" divested themselves of all chemicals of interest. Defs.' Reply at 21. It explains, however, that it cannot readily identify those facilities from its records. Many of the records it keeps on facilities are not "searchable," Falcon Reply Decl. ¶ 12, meaning that Greenpeace's approach would require manually combing through the records for each facility to determine the

reasons why it was "de-tiered." And even to the extent DHS's records are easily searchable, they do not contain the information that Greenpeace desires. The recorded reason a facility is de-tiered may be that it has brought a single chemical of interest below its STQ—even though the facility still has other chemicals of interest at or above STQs. *See id.* ¶ 13.[4] And even if DHS did plumb its records to identify facilities that have "completely" removed chemicals of interest, the records do not capture whether facilities have "permanently" removed chemicals of interest—a fact that DHS simply does not track. *See* Falcon Reply Decl. ¶ 14. Indeed, the facilities themselves may not know with certainty that they will never again possess these chemicals.

In light of these facts, the Court agrees with Defendants that they have satisfied FOIA's segregability requirement. FOIA only requires the government to release all "*reasonably segregable*" information. 5 U.S.C. § 552(b) (emphasis added). Greenpeace effectively wants DHS to determine which facilities have *no* risk, so that their names can be unredacted. But DHS does not make such determinations in the ordinary course. It decides whether facilities are "high risk;" it does not determine which facilities pose "no risk." Unsurprisingly, then, DHS does not generally record facts—such whether facilities have "permanently" divested themselves of chemicals of interest—that would be necessary to make a "no risk" determination.

DHS no doubt *could* undertake to identify "no risk" facilities, and perhaps would even succeed at identifying some of them based on information it already possesses. FOIA does not,

---

[4] Defendants explain that the congressional testimony Greenpeace cites, which referred to facilities that "completely" removed or "eliminated" all chemicals of interest, actually meant the reduction of all chemicals of interest to levels below STQs. Defs.' Reply at 22. This explanation is backed up by Defendants' declarations. *See* Fuentes Decl. ¶¶ 19, 30. Greenpeace has offered no evidence rebutting these declarations, and so the Court concludes that the testimony was not based on DHS's knowledge of any facilities with absolutely no chemicals of interest.

however, require agencies to "create records," "conduct research," or otherwise "dig out all the information that might exist, in whatever form or place it might be found." *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 269 (D.D.C. 2012). Nor does it require agencies to "perform searches which are not compatible with their own document retrieval systems." *People for Am. Way Found. v. DOJ*, 451 F. Supp. 2d 6, 14 (D.D.C. 2006) (quoting *Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 218 (D.D.C. 1989)). It certainly does not require DHS to undertake an individualized analysis of 2,733 facilities to determine, in the first instance, which should be considered "no risk." But as Greenpeace admits, it wants DHS to do just that: "to review the files for each facility." Pl.'s Reply at 21. Because DHS cannot determine which individual facilities pose no risk without an unreasonable effort, its segregability approach—redacting any name that could serve to identify a facility—passes muster.[5]

## IV. Conclusion

For all of the above reasons, Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment (ECF No. 11) is **GRANTED**, and Greenpeace's Motion for Summary Judgment (ECF No. 14) is **DENIED**. The Court will dismiss Greenpeace's second claim for relief (APA) for failure to state a claim, dismiss Greenpeace's third claim for relief (mandamus) for lack of subject matter jurisdiction, and enter judgment for Defendants on Greenpeace's first claim for relief (FOIA), in a separate order.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 1, 2018

---

[5] Indeed, given the nature of this information, the Court suspects that DHS's initial approach—withholding this information entirely—was the correct one.